Case 23-1382, Shawn Hart et al. v. City of Grand Rapids MI et al. 15 minutes for the appellants. 15 minutes to be shared by the applicants. Mr. Desmond, you may proceed for the appellants. Thank you and good morning, Your Honors. Christopher Desmond from Johnson Law on behalf of the plaintiffs, Shawn Hart and Tiffany Guzman. Your Honors, I know you're very familiar with this factual record, so I'm not going to do an overview of the facts. I want to get right into the arguments. And I'm going to start today with the excessive force argument against Defendant Reinink. Because to me, that's kind of the most egregious error in my mind that the trial court committed here because it appears to me that it's just a straight credibility determination by the trial court. And so, you know, and I know the trial court is aware of this law. It's cited to it as well. But we've cited to the court, I think it was Anderson v. Liberty Lobby for the very well-accepted notion that credibility determinations are strictly reserved for juries. And what happened in this instance is the district court recognized that law. But it kind of oddly stated that, well, I'm not really making a credibility determination here because there is essentially circumstantial evidence that corroborates Officer Reinink's account. And really what the court was looking at was the testimony of other officers. Can I just stop you for one minute? Yes, Your Honor. Just to locate the bench, a credibility determination with respect to what? With respect to Officer Reinink's account of how these events occurred. Which particular aspect of that? The fact that he mistakenly fired a speed heat munition, which he thought was a close-range beanbag munition. Does it matter whether he made a mistake or not? I mean, I thought Graham from the Supreme Court says that officer intent doesn't matter. That an officer's good faith intent can't turn excessive force into reasonable force and vice versa. I agree, Your Honor. And I think that the error of the district court doesn't simply relate to credibility. But that was, so the argument that we made relative to Officer Reinink is this is excessive force, whether it's intentional or not. Because the type of force that he utilized here wasn't responsive to the situation. It was excessive in any regard. And the case that we cited to for that was the Cimineo case. And I think Cimineo really is the best case for this court to look at for each of the officers involved in this case. Because Cimineo was a case that involved an alleged riot situation. It involved a situation where the plaintiff in that case was walking toward an officer who had been firing beanbag munitions at people. The officers in that case alleged that the plaintiff had actually thrown an object at the officers while he was walking toward them. And the officers then shot him with a beanbag munition. And this court said that it was excessive force. Because he didn't pose a threat and that that was a matter. Am I incorrect on the facts there? I understood that in that case there was a guy walking slowly with his hands above his head, attempting to comply with the dispersal order. Is that not the facts that he was leaving? He was with his hands above his head. My concern about that is that what we've got is somebody who has gone and come back and gotten out of the car and is walking toward the police line. Not with his hands up, actually at the beginning with one hand in his left pocket, which leaves the question of is there a weapon in the left pocket. Now I know he ultimately took it out, cigarette in the right hand. We see that, but at the time he was walking toward the line of officers after having driven off on command, after sitting there for a while, and then come back. Tell me why Camillo works for you. So first of all, Your Honor, I think I interpret the facts of Cimineo differently than you do. I think that there was testimony from various individuals in that case. The plaintiff, my understanding is the plaintiff was essentially saying, I was trying to remove myself from the situation. It was a chaotic situation where beanbags are exploding in the air, and I was trying to remove myself. And I think he was indicating that in order to remove himself, he was walking toward the officer who had been firing the beanbags. Am I incorrect that that case said that he was walking toward the officers with his hands in the air? You are not incorrect, Your Honor. The case says that that was the testimony of the plaintiff, and then it states that the defendant's account is that the plaintiff had thrown an object at the defendants prior to the firing of the beanbag. And so there was a disagreement between the parties regarding the conduct of the plaintiff. Prior to, you know, we segment these things. We do, yes, the segmented approach. It's awful, but yes, we do. In this segment, the guy had thrown something earlier. There is dispute about that. But there's no dispute that he was walking toward a line with his hands in the air. That's correct, Your Honor. I think that's correct. And is that not a really important distinction? I don't think it's particularly important. Why not? So I think under both Simonillo, and then there's another case as well. I think it's the Grawy v. Drury case, which I rely on more in regard to Defendant Bush. But in each of those situations when this court is talking about the type of munitions that are at issue in this case, whether it's a pepper spray or a non-lethal beanbag or speed heat munition, although, of course, I'd argue the speed heat munition, the way that it was used in this instance, was potentially lethal. But what the court says in that instance is if you haven't told an individual that they're under arrest, and if they're not actively disregarding orders, then you can't use that type of force. And I understand the defense is going to push back and say, well, the plaintiff was disregarding orders here. Now, we have contradictory evidence, I think, in the record regarding that point, because what my client testified to and what other individuals at this scene testified to is that because of sort of the chaos of the scene, you couldn't necessarily hear individuals. And this also involved masks that were over the officer's face that are concealing their mouths, that are obstructing the sound that's coming from their mouths. But weren't they using a PA system? I thought they were using the sort of PA system to broadcast, like, you must leave, you must disperse. There were general messages that were going out over a broad PA system, according to the officers. My client and another independent witness, and I apologize, I don't recall his name right now, but it's cited in my brief with citations to the record. Another independent witness in this case said, I didn't hear those dispersal announcements. But there were those broad dispersal announcements, and then there were also the smaller conversations that were happening on a more micro, personal level between the individual defendants and my clients. Doesn't it matter whether your client actually heard? Doesn't it matter whether the officers would reasonably have believed that they must have heard? Right, because the question is, from the officer's perspective, are they reasonably using force? And so if they're broadcasting a message on the PA system, I mean, I think your client could be, you know, hearing impaired. I know that's not the facts of this case, but the officers wouldn't know that. So the plaintiff would not have heard it, but the officer would have no way of knowing that. Yeah, you're right, Your Honor. I think really what that leads me to sort of is just the traditional analysis that always applies under both Graham and Garner, right? Because you still have to have, when you have a use of force, you still have to have a totality of the circumstances analysis. And there's some disagreement between the parties here with what do you do with that analysis when you're in an alleged riot situation, right? I don't think that the term riot or the application of the term riot to a protest situation is enough to suspend the factors that apply in Graham and Garner, particularly when you're... I guess my struggle is it makes, you know, I'm very interested in this argument because I've looked at all these tapes. This was a riot. There is no question what was going on in this case was a riot. So what cases, the cases that you raise make a difference where there is that riot going on. What I'm struggling with is that there was the original drive up and the slow down and the police music and they stopped. All the people who drove by before in these videos, they pulled to that spot and they got out of there. This car pulled and stopped and stayed and then ultimately did leave but then turned around and came back. So explain to me why that's not a distinction that matters in this. Yes, Your Honor. So I don't think that the turning... First of all, I understand the classification of a riot. Whether I agree with it or not, I think the one thing that we can agree with is that my clients at the moment that they first interact with the police officers, they're not involved in the alleged riot that's occurring. These are individuals who are out fishing for the day and find themselves as they're driving through Grand Rapids, which if you're familiar with Grand Rapids, can be a fairly confusing city to drive through because there's a number of one-way streets. And what occurred here is my client was attempting to turn in one direction and an officer said, you can't turn in that direction, you have to turn in the wrong way. He was trying to communicate with the officer because he was having difficulty hearing him. This was the first... This is the first interaction. Then he left. Well, so he leaves, but there's an important event that happens before he leaves that explains my client's conduct. Whether it legally matters or not, it explains my client's conduct, which is Officer Benjamin Johnson walks up to the vehicle and points what my clients believe are a firearm directly in their vehicle at them. My client... From outside the window. From outside the window, but if it's a firearm, that's not going to matter. And so my client is upset by the fact that this officer committed what he believed to be an act of excessive force in that situation. So when he decides to return, he does so with the thought that I want to talk to Benjamin Johnson's supervising officer to find out why these officers are pointing guns at people that are simply trying to drive through the city of Grand Rapids to get out of the city. So that was his intent in talking to the officer. Now, the officers may not know that. Personally, I think the video supports that contention. I know there is a moment where my client has his hand in his pocket, but for the most part, he stops short of the officers. He walks up toward them. He's trying to get their attention. The officers have testified, and I think this was from Defendant Bush, that they didn't believe that my client had a weapon. They didn't fear that he was posing a physical threat to them. It was more about him complying with orders. They then, and this is another instance where I think this video really lends itself to interpretation, which I think the District Court improperly precluded a jury from being able to do, because the District Court says regarding Defendant Bush, well, I think this is different from, I think it was the Grawley case. I think this is different because he didn't spray him from very close range. I didn't find officers... There's no question in Grawley, he sprayed Grawley so much that Grawley fell unconscious on the pavement. No question. The spray here did not do that. It didn't do that. But I also don't think that that's, at least my reading of Grawley, isn't that that's what the court's ruling depended upon. That was a fact that was present there. But I don't think it was necessarily crucial to the court's finding. But I watched that video again last night, and I watched it this morning again before court. There can't be more than, with Officer Bush's arm extended, there can't be more than maybe an 18-inch gap between that can and my client's face. And then when my client turns around, there can't be more than four or five feet between him and Officer Reinick when he fires the speed heat munition directly at his chest. And so the District Court's interpretation of the video, I think, is different. But to answer your question, Judge Strange, I think Simonillo is the closest case because it's the one where this court said this was a riot situation. And it was a case where the plaintiff wasn't necessarily an active participant in that riot situation, but where he was alleged to be walking toward officers, where he was alleged to have thrown something toward officers, so engaging in an act of provocation, which he denied. I think that that is the case that gives this court the best roadmap. Okay. Oh, no, go ahead. So this is an excessive force case. The Supreme Court has told us that clearly established law for qualified immunity purposes needs to be decided at a very specific level of generality. And so what I want to know, I think that the only case you briefed with respect to Officer Reinick is Simonillo. That's your case that would put Officer Reinick on notice that his force was excessive in this case. So the whole ballgame is Simonillo. Well, in a way, Your Honor, but I think something that's very notable, and I think this is why the district court's ruling really did resolve on credibility, because Reinick says in his deposition, and I think it's page 78 of his deposition, I've got the proper site in my brief, but he says, yeah, if this was on purpose, this is excessive force. He says, I was not constitutionally... But on purpose, not on purpose, Graham tells us that doesn't matter. Right. So, well, then, Your Honor, I guess my response to that would be that Officer Reinick's position then is this was excessive force. Because Officer Reinick's position is I was not permitted to fire a speed heat munition at this plaintiff. And so when the district court conducted its analysis, it said that, yes, it would be excessive force if Reinick... Well, actually, I take that back. I don't know if the court said it would be excessive force if Reinick did this on purpose. But what it did say is I credit Officer Reinick's testimony, and I find it to be believable that this is not what his intent was, and he was permitted to use the lower level of munition that he was intending to use toward plaintiff. That was the district court's conclusion. Right. I agree that's the district court's conclusion. So what is your answer to this situation? We know Reinick was found to have engaged in excessive force by the police department. He was given 20 hours, two days, whatever, without pay. So he was punished for that. So what is your strongest case for saying that a mistake doesn't matter, that if it's excessive force, he is guilty of excessive force, regardless of a misapprehension or an error? Why do you disagree? What is your best reason for saying the court below was wrong? Yeah, well, I think what Judge Larson has indicated, though I think she's coming from a different perspective than I am, and what the district court acknowledged in its opinion, that Graham and Garner do talk about the fact that the law provides some leeway for reasonable mistakes to be made by an officer. It does provide that leeway, whether this was a reasonable mistake or not, because that is essentially what the district court was saying. The law allows for reasonable mistakes, and I think this was a reasonable mistake. That issue of, is this mistake reasonable or not, I think is a question of fact, because the district court's resolution of that necessarily depended on two things. First of all, a determination that it was a mistake. And second of all, a determination that that mistake was reasonable. And really what I think the district court did is it jumped right to, if it was a mistake, would it have been reasonable? And she said, yes, it would be, because these other officers testified that these munitions were generally the same size and that when you're loading them, you can easily confuse one with the other. So the district court concluded this was a reasonable mistake, but whether it's a mistake to begin with, I think involves issues of credibility that are enmeshed in this entire case that have to go to a jury at this point. And I think that's essentially what Simonillo was saying as well. Yes, we have an account from this officer that denies it was on purpose. You know, there's one last case, and I think I cite to this in my brief, but it's called Greco v. Livingston County. It was my case in front of this court. Judge Sutton wrote a published opinion in that case where he drew analogies to the Kurosawa film Rashomon, and he talked about how, you know, when you have two parties who show up and one party says, this is what I did, and the other party, and in that case specifically, an officer is walking with his police dog. And the police dog ends up getting loose and biting my client. And the officer says, I fell. It was a mistake. I fell, and I let go of the dog, and I lost control. What Judge Sutton said was, well, that's the officer's account. The plaintiff's account was that she saw the officer let go of the leash. And we can't say what happened. A jury needs to do that. And so here, I think this district court essentially said, Reineck says it was a mistake. And so what can we do about that? Reineck says that this was just a mistake, and I think it was reasonable. I think that's for a jury. We've let you go over your time. Any further questions?  I'm okay. Thank you, Your Honor. You'll have your rebuttal. Good morning to the panel. Douglas Curlow on behalf of Officers Bush, Johnson, and the City of Grand Rapids, and I have assured my colleague that I will not go over time so that she has plenty of opportunity to address Officer Reineck. We have in this case, as the court has already indicated, a wealth of video. At least as far as Officers Bush and Johnson, what they did is visualize from multiple angles by the videos that is available. In fact, we have third-party video. And I want to address for just a moment that third-party video documentarian. Yes, that was a documentary. It was mentioned by counsel that, oh, he said that you couldn't hear the announcements over the PA. Well, no. As pointed out in my brief, Mr. Villman said, oh, I could hear the announcements over the PA. I just couldn't hear them when I was standing next to Hart's truck because the music was blasting so loud. The question is, in the totality of the circumstances, what would an officer have objectively perceived about Hart and Guzman in that SUV? First, at the corner, when Johnson comes and supposedly points a gun at the vehicle, the court has already pointed out that the other cars were just going around the turn and leaving. In common sense, maybe I'm a goody-goody, but I'd have come into that situation and said, I've got to get out of here as fast as I can. I wouldn't have hung around. But from the officer's perspective, the fact that the car stayed, the fact that it was playing the particular song it was playing, the fact that the crowd was reacting to it, from an officer's perspective, that certainly gives the impression that these people are participants or at least encouragers of the riot that's in front of them. As I point out in my brief, that alone violates four Michigan felony statutes. So they perceived that there was already a criminal offense. That's the first element of the use of force analysis under Conner, or under Graham versus Conner. The second element is that they sense risk to themselves. I mean, obviously the case law says that particularly when you're approaching a vehicle, even just to give a ticket in a normal situation by the roadside, this is fraught with danger for an officer. To see a stopped vehicle that appears by all objective observation to be part of the rioters, and then you're approaching it, you don't know what's going on in that vehicle, it certainly would make sense for Officer Johnson to have, whether it was a launcher or his gun, in a high ready position. And the video shows... I thought that was conceded. I thought that it was said that he approached it with his launcher in the ready position. He did. And like I say, though, if you look at the video, whatever happened, no officer pointed anything into the car from any angle. And certainly in those circumstances, the case law allows an officer to approach with a gun drawn. So there was nothing wrong with what Officer Johnson did. In the second instance where we have Officer Bush then spraying, we've got a situation where now we don't just have maybe a debatable situation of a person being confused at a corner where they're being asked to turn. We've got a situation where that person has returned to the scene and has marched up to confront a line of officers. The idea that this was to speak to somebody's supervisor about what had happened to the car just seems absurd in the context in which we've got. Well, it's true it doesn't matter because the officers can't know that. Right. But certainly for the officer's perspective, yes, it looked like this guy was coming up to make a confrontation. Johnson sprayed. Under the case law, and the real case that's really applicable... Bush sprayed, right? Bush sprayed. Yes, Bush sprayed. The real case that's applicable, and I hope I pronounce this right, Abderrahim v. City of Columbus, which is the case we cite, that's where you have the person who claimed they were exiting after hearing the calls to disperse from a riot, and then the officer used spray. In that case, this court having analyzed the, and that was after the events in this case, that court having analyzed the case law of this circuit said, you know, there was no established case law that said you couldn't use the spray in that circumstance. And I think that's exactly the circumstance in which Officer Johnson, in fact, Johnson had a worse situation because this person was one he had known, had been at the scene, and had deliberately returned, heightening the risk of what the officers faced and heightening the need to make them leave. Abderrahim, I think, because it, after this... Yes. After this, when you need a clearly established law at this time, you say that the court then looked back...  ...and said, we've already decided this stuff. No, it says the law was not clearly established. Well, that's what I mean. We've already, we're already saying that it was not clearly established. Yes, yes. Is it not problematic that this case came out later? If this case came out? So the case that you want to rely on came out later saying we are not clearly established. Do you think that's functional for your case? Well, sure, because it wasn't clearly established when Abderrahim came out. It's certainly not clearly established when my client acted. Okay. And just last, the point I want to touch before I yield the floor, in the situation we have here, there was no violation of the Constitution by Officer Johnson or Bush. There's no basis for municipal liability on the part of Grand Rapids. And even with regard to Reinink, his own testimony is certainly not helpful for himself, that I violated my training. I've known since 2017 that you couldn't use these speed heats at short range, and I knew I was supposed to have somebody watch me. All the testimony is somebody is supposed to watch specifically to avoid this situation. And Reinink said, had I followed my training and had somebody watch me, this wouldn't have happened. So there's really no basis for liability on the part of the city of Grand Rapids on a training theory, which in fact they abandoned, as we point out in the brief. And lastly, as to ratification, there's no basis of a record of the city having ratified anything with specific facts to say that the city has glossed over this kind of conduct. So there's no basis. Certainly, as statistics matter, and the failure to ever find these charges, the statistical information that the chart that contained the excessive force claims filed between 2015 and 2020, complete no finding of excessive force in that whole category of cases, right? But the unfortunate problem for the plaintiff is that they don't have any details as to what those cases were even about. And as pointed out in the Pineda case versus Hamilton County, Ohio, and Berry versus City of Detroit that we cite in our brief, they can't rely on raw numbers. There has to be some factual information as to what we know that the cases were comparable in order to make an assessment as to whether the city was, in fact, glossing over anything that was a similar situation. We just have raw numbers, and raw numbers leave it to nothing but speculation, according to the case law of this circuit, both the Pineda case and the Berry case. I would agree that it may not rise to the level in this case, but those statistics are concerning. But I don't think that, like I said, I don't think they help in this case under the published precedence of this circuit. Anyway, I need to thank you. Good morning, Your Honors. Marcy Stepanski on behalf of the defendant, Appellate Officer Reinick. I would just like to start off with addressing opposing counsel's argument with respect to credibility. Judge Beckering didn't say, you know, I think that she didn't make, like, personal findings. What she said was that the evidence, based on the testimony, the video evidence, everything that we had here, and Judge Beckering, by the way, is one of our more liberal judges that we have in the bench in the federal court in Michigan, and she did a very careful, exhaustive, and thoughtful examination of the evidence. I think the opinion was almost 40 pages long. And what she concluded was the evidence was very one-sided. There was nothing to suggest that this was done intentionally. This was an unprecedented event. The situation was very chaotic. There was an IED that went off at the Secretary of State's office. Officers were barricaded in the police department. There were bricks being thrown, fires being set. The officers were trying to secure the police department by pushing the protesters back. And these munitions that they initially had on their persons had run out very quickly. I mean, this devolved into a bad situation around 9 o'clock, and this incident occurred at around 1140. So these were hours into this. Is this the best case for saying that a claimed mistake is sufficient to authorize summary judgment and to take the case from the jury? Yes, Your Honor. There are a wealth of Supreme Court cases that we cited in our brief. That's where the court has said if the action is reasonable, even if mistaken, qualified immunity applies. And given the fact that these munitions look almost identical, same color, same size, same shape, same weight, and the officers were trying to replenish very quickly under very stressful circumstances, where they were going to an armored vehicle to try to get some more munitions. They were going to backpacks that were on the ground. They were going to some additional munitions in the intersection. Based on all of those events, it's a mistake that he did that, but it was a reasonably, objectively reasonable mistake is what the lower court held. The police department found him guilty of excessive force and punished him. Well, so they did, Your Honor, but that's... But, okay, and that is... There's a wealth of case law that suggests as well that violation of an internal policy does not equate to a constitutional violation because we want to encourage our police departments to have loftier, more demanding standards of their officers. And if we start equating those things, you know, if you're holding your officers to a higher standard to being a constitutional violation, that discourages those police departments from doing that. So a violation of an internal policy does not equate to a constitutional violation. There are different factors that are examined and different laws that apply. Okay, but I guess the question is, the difference is not... They don't have to decide that it was a constitutional violation. The question is, can it be taken away from the decider of fact, the jury? Yes, because the evidence is only one-sided here. There was nothing to suggest that Officer Reinick did this intentionally. Judge Beckering went through that entire analysis explaining how he handled the munition as if it was a muzzle blast munition as opposed to a speed heat munition. He didn't even think that it struck him by the plaintiff's response initially and didn't even find out about it until days later that it was actually a speed heat munition. But I guess I'm wondering whether we even have to engage this question. So let's assume that there's no mistake. It's the plaintiff would have to show us clearly established law that would say that the officers knew in these circumstances that they couldn't use the level of force that they used and the plaintiff has come forward with semi-neo as the case. And that one seems pretty distinguishable because in that case the guy was putting his arms up in the air and trying to surrender. That's correct, Your Honor. Semi-neo is highly distinguishable. We went through the details in our brief and I know Judge Gilman was on that panel and he's familiar with the facts of that case. But that case is so different from ours. This is a person who testified, I was under the impression that I was going to a party, I saw a friend on a porch, I stopped and talked to him. When things started turning ugly I tried to leave, I tried to go through a backyard. Somebody confronted me with a bat and said, you can't come through here. So then my best option was to raise my hands and approach the intersection and try to leave. Here we have a person who not only came through one time and didn't leave upon orders to leave, came back a second time and continued to incite the crowd. They were yelling, yay he's back, kill the cops, things like that. So you're right, Your Honor. This is a situation where they have the burden, plaintiff has the burden to provide case law that shows that this violated clearly established law. And the closest case that they've cited is semi-neo and that doesn't carry the day. In addition to that, the Graco case that they cited is also highly distinguishable. In that case it wasn't just that the officer said, oh I fell. It was the plaintiff who said that the officer directed the dog to attack. So there was the classic credibility issue there. There's nothing like that in this case. Let me ask you this. Hart is unarmed. Reinick knows he's unarmed. He's not right in their face. There's a line of officers. There was no real threat from Reinick. Yet he's using potentially deadly force against him, even if it's mistaken. Maybe he wouldn't even have been entitled to use the muscle blast. It had to be clearly established that you can't use excessive force, particularly potentially deadly force against an unarmed man who's not a threat. Are you saying that that's not the case? Well, Your Honor, I don't think that Reinick, I don't think we can say that Reinick knew he was unarmed. He certainly didn't pull a gun out from his pocket, but I think there was no way to know whether he was unarmed. But when we look at... Wait, wait, just a minute. The point where after Sergeant Bush at Pepper sprayed him and he turned around and then he turned around again, he had a cigarette in his right hand and nothing in his left hand, which was then out of his pocket, and that was before Reinick fired the speed heat. Isn't that the fact? That is correct, Your Honor. But we can't look at that in isolation. This is a person who had left once and come back, parked his car, got out, walked toward the officers, refused to leave. After the pepper spray was used, he didn't even leave then. He turned back around towards them. And he even said, the plaintiff even admitted, which corroborates the officer's perspective of the plaintiff, the plaintiff testified, I turned back around as if to say, what else do you have? You know, like an aggressive posture. And that corroborates what the officers were saying too. This guy was not going to give up. And so given all of the facts of the things going on around them and him kind of spearheading this inciting of the crowd, they objectively, reasonably, released another ammunition to get him to leave. This is someone who had his truck and was revving his engine and playing F the police, and people were yelling, yay, he's back, go get him, kill the cops. This is a very volatile situation. This is, you know, the classic and quintessential quickly evolving or devolving intense circumstances that our court allows for these types of, you know, deference to officers and decision making in those tense moments. Oh, I see my time is up. What about Bush's testimony that he had never heard of an officer anywhere? Mistaking these two canisters. Well, because they hadn't rarely even used these other than in training, this was like an unprecedented event. And I do want to point out that this incident would never repeat itself now because they have since decided to, if you have a person on the SRT team, one will deal with muzzle blasts or muzzle munitions, the other one will deal with the scatchaw one, someone else will deal with the speed heat. That doesn't resolve this case. Right, right, but it just shows that, and the reason is because of the similarity, how similar that they do look. Richard Pryor knew in advance that he was not supposed to load this munition without a witness, right? He did. Not confused the two, and he disregarded the police department's policy. That's correct, Your Honor, but I think it's because of the tense circumstances that they were under. This was not a situation where they were going on like a search warrant or a raid, and you have time to do that. This is something where they had run out of munitions, and the lieutenant said, go get more, go get more, and they were running and trying to replenish what they had to try to push that crowd back. They had tied a belt around the front door of the police department to try to lock them inside. I mean, this is not something that happens at leisure where you can say, hey, buddy, can you look over here and make sure that I'm loading this correctly? In a perfect world and ideal circumstances, yes, that's what we want, but in this situation where they're in fear for their lives, they're throwing bricks and cement and starting fires and setting off IEDs, this was a very chaotic, scary situation. Maybe that's all the more reason that you should follow policy and make sure you have a witness of what you're loading when you've got something potentially deadly. And again, in a perfect world, I think that's what we all want, but this was one of those situations where our courts have given deference to officers and have said, when you have to make split-second decisions in situations that are extremely tense, we allow those mistakes and still find the officers entitled to qualified immunity. What is the closest case that you can name? I know you have several. I know that's the generic law, but what case do you have that's the closest to this one that would show that this is an acceptable mistake in the use of admittedly deadly force? Oh, okay. Let's see. You know, there's so many that talk about it. I don't know that there's one that's on point for us right now, but I know it's the plaintiff's burden to point to a case that would defeat qualified immunity, and they have not done that. But in terms of the reasonable mistake, and Pearson discusses it. Let's see. Gosh, there's so many. I'm not sure if Chappell discusses it. Supplement it with your best couple of cases. Okay, will do, Your Honor. Unless there are any other questions? Thank you, Your Honors. Thank you, Your Honors. Very briefly regarding this issue of intent, which Judge Larson, I know you and I were talking about this quite a bit, the idea of mistake. One thing that I think is important to note is that this case law that discusses, while there's room for reasonable mistakes, it doesn't necessarily make the distinction between the type of force that is used. But the type of force that is used does matter. Graham and Garner both make it clear that you can't use lethal force against individuals that don't pose a threat to the life of either the officer or a member of the public. Right, but we can't frame the clearly established inquiry at that level of generality, right? So you can't say, I mean, yes, that might be the constitutional rule, but the question is, would the officer know in these circumstances? And you can't just say, well, it's clearly established that deadly force requires a sufficient threat. I mean, the Supreme Court said that in Mullenix versus Luna, that that's not the right level. I mean, that was a direct quote. So yes, Your Honor, I agree. But I think we've gotten to such a bad place when it comes to this level of specificity. And I know that's a problem I have to deal with when it comes to clearly established in general. But no, you're not. But what I will say is I don't think we've ever gotten to a point where any officer can debate that, well, I didn't know that I couldn't use lethal force against this person that I admit was not armed, did not pose a threat to me, or did not pose a threat to any other member of the public. But the facts in this case don't show that. I think they do, Your Honor. I think they show, there's an acknowledgement here from everybody, that this speed heat munition in the way it was used is tantamount to lethal force. That might be true. So then there's the question of whether they reasonably perceived that he posed a threat. Nobody has said, nobody in this case has said that Sean Hart posed the type of threat that would have allowed someone to use lethal force. What Ryan Nix said is, I only used that level of force because I didn't think I was using that level. I didn't think I was using lethal force. It turned out I was, but I didn't think I was. And Judge Beckering said, well, I think he didn't intend to use lethal force. I think he intended to use something less than lethal force, which was permitted in this scenario. That involves a credibility determination. And when defense counsel says, well, look at the way that he was holding his launcher, he was holding it in a way that you wouldn't hold it if you thought you had a speed heat munition. Well, that's such circular logic because we're accepting the conclusion that his act was he shot my client with lethal force from several feet away. So if he wants to say, well, no, I've never done that before. Why would I have done it in this instance? I don't know. Maybe it's because my client was at this scene and he was playing a song you didn't like and you perceived him to be someone who was riling up the crowd and you were angry about the circumstances. And you lost your temper and you used a level of force that wasn't supported by the circumstances you faced. But again, I think that's an issue for a jury in this case. I wanted to address the Monell liability. I see that I'm out of time, so I don't have that. Well, Judge Strange, it's extremely concerning. I mean, you know, to say, yeah, it turns out that citizens of Grand Rapids are just prone to complaining about excessive force all the time, but none of them are substantiated. It doesn't ever happen. None of this is true. And then for Officer Reinick's counsel to say, well, this was a policy violation and he's suspended because we want departments to be able to ensure their officers are complying with the law. That's not the impression I get from what's happening in Grand Rapids. Your opposing counsel says, correctly, it's your job to take the list and find the ones that are like yours and show them to us. Sure, yeah. But I mean, that's very convenient for a governmental defendant to be able to essentially just shut down citizen complaints and say, yeah, it's not substantiated. Our officer didn't do anything wrong. And here's a list that shows all these general complaints, but we don't have further information about it. We don't have discovery tools to be able to investigate 90 different complaints. All we know is there is a trend of a lot of excessive force complaints in Grand Rapids, and they all seemingly go away. So thank you, Your Honors. I appreciate your time. We thank you both, all three of you, for your briefing and your arguments. They're very helpful. It's a quite complicated case. It will be taken under advisement and an opinion will be issued in due course.